## Poor *vs.* Poor.

Where a wife applies for a divorce, on the ground of extreme cruelty, the suit will not be sustained, if it appear that the injurious acts of the husband were drawn upon her by her own misconduct, unless the injury done her is out of proportion to the offence on her part.

This was a libel, filed by a wife, and praying for a divorce, on the ground of extreme cruelty on the part of the husband.

*Emery* and *Bartlett*, for the libellant.

*James Bell*, for the libellee.

The opinion of the court was delivered by

RICHARDSON, C. J.    The parties in this case were married on the 7th March, 1816.    They have no children. The husband is proved to be a man in easy circumstances, and of a hasty and irritable temper.    The wife is shown to be a very active and efficient manager of her household affairs, and of a high, bold, masculine spirit; somewhat impatient of control; in a high degree jealous of the liberty that belongs to her as a wife, and not always ready to submit, even to the legitimate authority of her husband.

For aught that appears in this case, they lived in peace and harmony, without any serious difficulty, until some time since the year 1830, when the wife, having become a professor of religion, united herself to a church whose doctrines and opinions the husband did not approve.    And this diversity of sentiments in religious matters seems to have been the original fountain, whence has flowed all the bitterness which has since existed between them, and which has driven them into quarrels, squabbles and encounters, that certainly do no credit to either party.    The result of these broils was, that the wife left the house of the husband, and has since resided separate and apart from him; and she now claims to have the bonds of matrimony dissolved, on the ground that in the contest which ended in their separation, he exercised a tyranny over her which amounted to extreme cruelty.

In a contest about religion between two persons standing in the relation, and having the dispositions and tempers of these parties, it is hardly to be conceived that the blame could have been all on one side.    Mere profession of religion weighs nothing in such a case.    If the spirit of the gospel abide with one of the parties, not in word only but

in its power, there can be no contest ; whatever wrong or injury there may be on the one side—all will be patience and suffering on the other. Where strife is, there is every evil work. But that wisdom which is from above is first pure, then peaceable, gentle and easy to be entreated, full of mercy and good fruits. This is the language of inspiration.

The evidence in this case shows much strife between these parties ; and an attentive examination of that evidence will enable us to see who has been to blame.

One of the complaints of the wife in this case is that the husband has often addressed her in harsh, abusive and profane language. This charge is sustained by the evidence, and his conduct in this respect can be viewed in no other light than as unmanly, indecorous, and in the highest degree reprehensible.

And in the case of a woman of a meek and quiet spirit, incapable of rendering evil for evil, or railing for railing, but patient in all her tribulations, such language on the part of a husband, often repeated, wantonly and unprovoked, would go a great way, and be a circumstance of much weight, in making out a case of extreme cruelty. But here much of the evidence on both sides, and even the tone and temper of the affidavit which she has drawn up herself and filed in the case, indicate in the wife any thing rather than a meek and quiet spirit. And one of her own witnesses says that her conduct was often provoking and vexatious. She herself admits, in her affidavit, that she sometimes used passionate language, but says she used it only when he gave her occasion. It is very likely that she may think she had always an occasion for the passionate language she used ; and it is equally likely that he may think he had an occasion for the harsh and abusive language he used towards her. It is not proved that he used such language wantonly and unprovoked on any occasion. And if a wife chooses so to act and to talk as to raise a storm in the temper of an

irritable husband, it is doing her no injustice to say to her, when it has come attended only with harsh and abusive language, that she has had in its peltings her just and merited reward. However reprehensible his conduct may have been in this respect, she is not to be heard, when she would complain of it. She ought not to be heard to complain of abuse which she has wantonly provoked.

Her next complaint grows out of a contest between them with respect to some wood, in August, 1833. Her story is that she sent a little girl out to procure some wood—that Poor met the girl at the door and told her " *she should not*"— that she then went herself for the wood, and as she went out he went into the house. When she returned, she found the door fastened—upon which she threw her wood into the house through the window, and took a crow bar and knocked at the door—that Poor came out in a great passion, and using very profane language, which she repeats, but which we shall not, took the crow bar from her by force—that she screamed murder and he stopped her mouth. But at length she escaped, and soon after deserted the house.

Now in this account it is virtually admitted that she went out in open rebellion against the known will of her husband. And the throwing of the wood into the house by the window, the use she made of the crow bar, and her screams of murder when he took the bar from her, indicate a spirit and temper quite too belligerent, when indulged against a husband, to be becoming in a lady.

But her witness, Palmer, adds other material circumstances, which she has omitted. Palmer says that Poor told the girl not to take the wood that was on the other side of the road, but to take it from the mill house, because he wanted to clear that—that upon this Mrs. Poor came out and said that she sent the girl, and intended to have the wood. He further says, that she struck the door with the crow bar and made several dints in it, which are still visible; and that after Poor took the bar from her she threatened to go to a

magistrate and compel him to give sureties of the peace, and that Poor told her she had better go into the house. Such is the transaction, as it stands disclosed in the evidence. There seems to have been nothing unreasonable or improper in the direction which the husband gave to the little girl. And the temper in which the wife went forth from the house, and her declared intention of having her own will and her own way, in defiance of him, which was immediately carried into overt acts of rebellion against his authority, show her to have been entirely in the wrong on that occasion. She was to blame in the beginning : and she carried out the quarrel in a manner which all candid and impartial minds must pronounce to have been equally inconsistent with her connubial duties and her religious professions.

In the skirmish which ended in his taking the crow bar from her, she seems to have encountered some of

——— " The perils that environ
The man that meddles with cold iron,"

and to have been rather roughly handled. But considering the irritable temper of the husband, it seems to us that she escaped with quite as little injury as she could have had any right to expect, in such an attempt to take his castle by storm.

Her next complaint is founded upon a quarrel between her and her husband which took place upon the Sabbath.

The account which she gives of the matter in her affidavit is, that she asked Poor to let her have the horse and chaise to go to church. This he refused, because he did not like the minister. She then ordered the boy to put the horse to the chaise, and went out herself to the chaise house to assist the boy. Finding the chaise house locked, she requested Poor to let her have the key, which he refused. She thereupon took hold of the door, *" and made as though she would open it."* Upon this Poor came out and struck her upon the head, and made her head ache for several days.

Such is her account of the affair. But her witness, Pal-

mer, states other material circumstances, which she omits. He says that she went out to the chaise house and attempted to force the lock with a wedge—that Poor came out, and took the wedge from her, and ordered her to go into the house. She, however, still persisted in her attempt to obtain the chaise, until Poor struck her.

Now, in this instance, the quarrel had its origin in the misconduct of the husband. No good reason is shown why the use of the horse and chaise should not have been freely accorded to her. And his refusal of her reasonable request, not only has the appearance of great unkindness, but of a tyrannical attempt to embarrass her in the enjoyment of that religious liberty which belongs to every wife.

But it was the Sabbath—and, under the circumstances, what course of conduct did duty prescribe to a christian wife and to a member of the church? The very essence of the religion she professes is, that charity that suffereth long and is kind, which vaunteth not itself, doth not behave unseemly, is not easily provoked, and not only believeth and hopeth, but *beareth and endureth all things*. What course of conduct, then, did duty prescribe to one who professed to have adopted that religion as the guide of her life? If when ye do well and suffer for it, ye take it patiently, this is acceptable with God, says the bible. What course of conduct did duty then prescribe to one who professes to believe the bible to be the word of God? In my judgment, there cannot be any diversity of opinion on these questions. It was due to the day, it was due to the religion she professes, it was due to the relation in which she stood to her oppressor, that, if she could not obtain his consent by kindness and condescension, she should have submitted in silence to the wrong he was doing her.

But instead of this, regardless of the day and of the modesty and of all the sober virtues that belong to the character of a pious matron, at the head of a respectable family, and

setting her husband completely at defiance, she at once undertook to accomplish her purpose by force and violence; and in this course she persisted, until, provoked by her perverse obstinacy, the husband was left so far to forget himself as to strike her. Whatever the old books may say upon the subject, there never was, in my opinion, in the relation between husband and wife, when rightly understood, any thing that gave to a husband the right to reduce a refractory wife to obedience by blows. And at this day the moral sense of the community revolts at the idea that a husband may inflict personal chastisement upon his wife, even for the most outrageous conduct. The blow given by the husband in this case deserves the severest censure. All must condemn it. But I am much mistaken, if the stubborn obstinacy with which the wife set him at defiance, and the violence she used in her rebellion against his authority, will not, under all the circumstances, be quite as revolting to the moral sense of an enlightened and a religious community, as the unmanly conduct of the husband.

She farther complains of personal violence inflicted by the husband in the quarrel about making matches. The account she gives of the transaction in her affidavit is, that while she was making the matches, according to his directions, and obeying him in all things, he, without any provocation, became violently enraged, and having beaten her cruelly with a horse-whip, imprisoned her in the cellar.

Her story is confirmed in some particulars by Palmer, who says he heard a dispute between the parties, and two blows of a whip, and saw her come up from the cellar. And Caswell says he saw Poor strike her two or three times with a whip, but not very heavily. He also saw Poor carry her into the cellar. This witness further says that the parties talked very angrily. Elizabeth Jewell says she heard blows of a whip, and afterwards saw marks of violence upon the person of Mrs. Poor.

She has another complaint of personal chastisement inflicted by the husband, in the dispute about certain papers belonging to the society for educating pious young men, of which society she was treasurer. Her account of this affair is, that Poor took the papers from her drawer and put them into his desk—that she demanded them, and he refused to restore them—that a few days afterwards she had an opportunity to obtain possession of them, in his absence, and took them away. When he came home and was informed of this, he flew into a violent passion, and using very profane and abusive language, finally horse-whipped her. Her account is in some respects confirmed by the testimony of Elizabeth Jewell, who heard the blows, and afterwards saw marks of personal violence.

Such is the case presented by the evidence laid before us on the part of the wife. And I shall, in the first place, consider whether, upon the case thus presented, she is entitled to the decree she asks. It then becomes necessary to consider the true nature of the relation between husband and wife, and what is to be deemed extreme cruelty, within the meaning and intent of the statute.

In scripture the wife is represented as standing, in some respects, in the same relation to the husband as the husband stands to the Redeemer, and the Redeemer to God. The words are : The head of every man is Christ, and the head of the woman is the man, and the head of Christ is God.

And in our law the wife is considered as being, in some respects, subordinate to the husband, who is the head of the house. The husband and wife are, in the contemplation of the law, one. Her legal existence and authority are suspended during the continuance of the matrimonial union. All her personal property vests in him, and he is bound to support and maintain her in a manner suitable to her situation and his condition. He is made answerable for her debts contracted before the marriage. And during the continuance of the union he alone is responsible for crimes commit-

ted by her in his presence—the law not considering her, in such a case, as acting by her own will, but by his compulsion. He is answerable for all torts and frauds committed by her; and if committed in his company, he alone is answerable. And she is wisely made subject in many things to his authority, as he is subject to the laws under which he lives.

But a wife is neither the slave nor the servant of a husband. He is the head of the house, to whom as such she is subordinate. But she is at the same time his companion, the partner and sharer of his fortune, in many respects his equal; who in her appropriate sphere is entitled to share largely in his authority. And he is bound, not only to honor and support her, but to accord to her freely and liberally all her rights, and to guaranty to her the full and free enjoyment of all her just privileges and prerogatives as the mistress of the family. In a particular manner he is bound to leave her free to enjoy her own religious opinions, and worship God according to the dictates of her own reason and conscience; and not to molest or restrain her in this respect, provided she does not in her zeal disturb the public peace, nor rebel against his lawful authority.

Such is the equality and dignity which our laws confer upon the female character; and such the relation in which husband and wife stand to one another.

What then is extreme cruelty? It is not mere austerity of temper, petulence of manners, rudeness of language, a want of civil attention, or even occasional sallies of temper, if there be no threat of bodily harm. It is not the denial of little indulgencies or particular accommodations. Such denial may in many cases be extremely unkind and unhandsome, and disgraceful to the character of a husband, and yet not amount to the cruelty intended by the statute.

To constitute extreme cruelty in a husband, his misconduct must be such as to show that the inward knot of marriage, which is peace and love, is untied, and that he exerci-

ses over his wife, not the mild and salutary authority of a husband, but a harsh and cruel tyranny.

In the judgment of law, any wilful misconduct of the husband, which endangers the life or the health of the wife ; which exposes her to bodily hazard and intolerable hardship, and renders cohabitation unsafe, is extreme cruelty. And in order to amount to such cruelty it is not necessary that there should be many acts. Whenever force and violence, preceded by deliberate insult and abuse, have been once wantonly and without provocation used, the wife can hardly be considered as safe. 2 *Kent's Com.* 126 ; 1 *Eng. Ecclesiastical R.* 232, *Smith* vs. *Smith ;* 4 *Mass. R.* 588, *French* vs. *French ;* 2 *Paige* 502 ; 7 *N. H. R.* 196 ; 2 *Eng. Ecclesiastical R.* 208, *Hulme* vs. *Hulme.*

But it is a well settled rule, that a wife is not entitled to be divorced on the ground of ill treatment received from her husband, if that ill treatment has been drawn upon her by her own misconduct. The cruelty which lays a just and legal foundation for a divorce, must be unmerited and unprovoked. When she is ill treated on account of her own misconduct, her remedy is in a reform of her manners, unless the return from the husband is wholly unjustified by the provocation, and quite out of proportion to the offence. 2 *Eng. Ecclesiastical R.* 163, 164 ; 4 *do.* 452, *Holden* vs. *Holden.*

Such are the rules of law that are to govern this decision ; and there is very little difficulty in the application of them to the facts in this case. With respect to the quarrels and contests between the parties about the wood, and about the horse and chaise, there is no doubt. Whatever may have been the ill treatment which the wife received on those occasions, it is very manifest she drew it down upon herself by her obstinacy and ill conduct. Nor does the return made by the husband appear to have been much out of proportion to the offence.

With regard to the quarrel about the matches, it is very

clear, that such was the conduct of the husband on that occasion, that if it is to be considered as altogether wanton and unprovoked, it entitles the libellant to the decree she asks.    To beat a wife with a whip, and then put her into the cellar without any provocation, is both unjust and tyrannical; and, even in a case of great provocation, it could hardly be considered as manly conduct.

It is not denied, that he struck her with a whip, or that he put her into the cellar; and she states in her affidavit that she gave him no provocation whatever.    This, however, is denied by him in his affidavit.

The parties were alone when the quarrel began, and no other person knows in what it originated.    It is proved that both very soon became very angry.    It is not at all probable that all the fault was on one side.    Nor is it likely that he would have proceeded to blows, if there was no provocation, but all was submission on her part.    The proofs which are in the case, of her conduct and spirit on other occasions, render it quite improbable that she was at this time beaten and abused for her meekness and condescension.

Besides, we have had an opportunity to compare her accounts of other transactions between herself and her husband, with the accounts which her witnesses give of the same transactions; and this comparison shows very clearly, that however fair her general character for truth and veracity may be, very little reliance can be placed upon her statements, when they relate to her disputes with her husband. Perhaps it would be too much to expect that she should, under the circumstances, give a full and fair account of those transactions.    It is certain, if her witnesses are to be believed, her accounts are neither full nor fair; and we cannot presume that her account of the occurrence we are now considering, is perfectly correct.

We entirely condemn the use of the whip by the husband, as unlawful and unmanly.    But no very serious injury

was done to her person; and her own affidavit, unsupported as it is by any other testimony, has failed to satisfy us that the conduct of the husband was wanton, unprovoked and unmerited,—which is essential, to make it a legal ground of a divorce. 2 *Eng. Eccles. R.* 163. Indeed, taking all the testimony together, it seems to us to be rather more probable, on the whole, that she may have designedly used means to provoke him to acts of violence, in order that she might have a pretence for leaving him, than that, wantonly and unprovoked, he inflicted personal chastisement upon her.

The same remarks, to a very great extent, are applicable in all their force to the quarrel between the parties about the papers belonging to the society for educating pious young men. The parties were alone during the whole contest, and they alone know the spirit and temper in which it proceeded. There are, however, two circumstances to be considered in this instance, which did not exist in the contest about the matches.

The wife was the treasurer of the society, and to take the papers from her without her consent and lock them up in his desk, certainly had the appearance, not only of unkindness, but of an unmanly meddling in a concern which was exclusively under the management of the ladies who belonged to the society, and must have been calculated to vex and irritate the wife.

On the other hand, her taking advantage of his absence, to open the desk and take away the papers, has in it too much of the

         *Flectere si nequeo superos Acheronta movebo;*

too much of a disposition to have her own will, and her own way, by foul means if not by fair, to be commended in a wife, and was calculated to exasperate her husband.

Now, considering the temper and disposition this lady is proved to have exhibited on other occasions, what is the probability as to her course of conduct when the husband came to reproach her for taking away the papers from his

desk in his absence ?   Did she endeavor to avert the gathering storm by meek and submissive behavior, or did she retort upon him his unmanly interference in the concerns of a female society, with which he had nothing to do ?   It seems to us much more probable that he was driven to violence by her provoking taunts—taunts which may have been the more provoking, because he felt in them the sting of truth and justice—than that he should have resorted to blows without any new provocation on her part at the time. And this presumption is much strengthened by the consideration, that the husband, although quick and hasty in his temper, does not seem to be naturally vindictive ; while the wife is shown to have been at other times quite as busy and active in a quarrel with her husband, as in the management of her ordinary household affairs.

And we are of opinion, on the whole, that however obnoxious to censure the conduct of the husband may have been on any, or on all the occasions to which we have adverted, the wife has no right to complain ; because it is in the highest degree probable that in every instance she drew down upon herself the chastisement she received, by her own improper conduct.   And it does not appear that on any occasion the injury she received was much out of proportion to her offence.   Her remedy is to be sought, then, not in this court, but in a reformation of her own manners.   Let her return to the path of duty ; and if to a discreet and prudent exercise of her just rights and privileges as a wife, she will join that meekness, patience and kindness which the religion she professes inculcates, and temper all her conduct towards her husband with that sweetness and goodness which belong to the true character of a wife, we think she will have no reasonable ground to apprehend any further injury to her person.   Let her submit to the authority of her husband, and remember that the dignity of a wife cannot be violated by such submission.   Let her return to the path of duty ; and by displaying in all her conduct the mild

and gentle spirit of the gospel, make that path a path of peace and safety.

And let the husband recollect that the first duty of the head of a family is to be master of himself, and to have his temper and feelings in due subjection to his reason and understanding, so that no provocation shall drive him, on any occasion, to unjust and unmanly acts of violence, or even to the use of profane and abusive language. And remembering his own infirmities, let him generously go forward, and not only invite but encourage his wife to return to her duty, by satisfactory assurances, not only that her person shall be safe, but that her feelings shall not be insulted again by profane or abusive language, and that her religious rights shall not be in any way abridged.

And let all those who attempt to advise them, consider who it is that has said,—" Blessed are the peace makers, for they shall be called the children of God."

Between these parties there is much to be forgotten and forgiven on both sides. But if they shall be disposed to retrace their steps ; and if those who are around them shall aid and encourage them in all their attempts at reconciliation, it is to be hoped that they will encounter no serious obstacle in finding their way back to domestic peace and happiness.